UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CONSTRUCTION COST DATA, LLC; JOB ORDER CONTRACTING GROUP, LLC; and MANAGED JOC SOLUTIONS, LLC, | § § § § | |
| *Plaintiffs*, | § § | CIVIL ACTION NO. H-16-114 |
| v. | § § | |
| THE GORDIAN GROUP, INC.; and R.S. MEANS COMPANY, LLC, | § § § | |
| *Defendants*. | § § | |

## REPORT AND RECOMMENDATION

Before the Court is Defendants' motion to dismiss Plaintiffs' First Amended Complaint. ECF No. 49. United States District Judge Keith P. Ellison referred that motion for a report and recommendation in accordance with 28 U.S.C. § 636(b)(1)(B). ECF No. 52. Having considered the parties' briefing[1] and the applicable law, the Court **RECOMMENDS** that the motion be **DENIED**.

## I. BACKGROUND

Plaintiffs Construction Cost Data, LLC ("CCD"), Job Order Contracting Group, LLC ("JOC Group"), and Managed JOC Solutions, LLC ("MJS") commenced this action in the 295th Judicial District Court of Harris County, Texas. Defendants The Gordian Group, Inc. ("Gordian") and R.S. Means Company, LLC ("R.S. Means") removed the case to federal court based on diversity and filed an answer. ECF Nos. 1, 7. Defendants subsequently filed counterclaims against Plaintiffs, naming All Cost Data Info, LLC ("All Cost Data"), Benjamin

---

[1] The Court did not consider Plaintiffs' surreply, ECF No. 53, because it was filed without leave of court. "Neither the local rules of this Court nor the Federal Rules of Civil Procedure allow a party to file a surreply as a matter of right." *Mize v. Quarterman*, No. 4:07-cv-3507, 2010 WL 644844, at *5 (S.D. Tex. Feb. 18, 2010) (Ellison, J.) (striking surreply filed without leave of court).

1

Stack ("Stack"), and Mark Powell as additional Counter-Defendants. ECF No. 29. All Cost Data was later dismissed for lack of personal jurisdiction. ECF No. 44. After obtaining leave of court, Plaintiffs filed their First Amended Complaint, ECF No. 48, which Defendants now move to dismiss.

The following allegations are drawn from the First Amended Complaint. Job order contracting is "a collaborative construction project delivery method that enables organizations to get numerous, commonly encountered construction projects done quickly and easily through multi-year contracts for on-call construction services with a single competitively bid contract." Am. Compl. ¶ 6. In 2013, JOC Group began providing estimating services to contractors involved in job order contracting. *Id.* ¶ 16. A central feature of the job order contracting process is the use of a "unit price book," which is essentially a list of preset costs for a wide range of specific construction tasks. *Id.* ¶ 7. JOC Group used the unit price books its customers selected, including unit price books Gordian and R.S. Means created. *Id.* ¶¶ 14, 16. On July 1, 2014, JOC Group entered into a one-year contract to provide estimating services for Region 4 Education Service Center ("Region 4 ESC"); another entity, The Cooperative Purchasing Network ("TCPN") approved that contract. *Id.* ¶ 17.[2] On January 6, 2015, TCPN notified JOC Group that the contract would be renewed for another year, expiring on June 30, 2016. *Id.*

Prior to 2014, vendors like TCPN had at least two choices for commercial unit price books: R.S. Means' and Gordian's. *Id.* ¶ 35. In July 2014, however, Gordian acquired R.S. Means in what Plaintiffs describe as "an attempt to dominate the industry and create a monopoly." *Id.* ¶¶ 15, 35. That acquisition gave Gordian and R.S. Means control of "100% of the

---

[2]  It is not clear from the amended complaint what the exact relationship is between Region 4 ESC and TCPN.

market" for unit price books, both nationally and in Texas. *Id.* ¶ 36. After the acquisition, Gordian marked up prices by about 30%. *Id.*

In 2015, Plaintiffs decided to develop their own unit price book and enter the market. *Id.* ¶ 37. MJS and CCD were formed in March and April 2015, respectively. *Id.* ¶¶ 18, 19. CCD was to develop a new unit price book that MJS would market and offer to contractors. *Id.* On May 28, 2015, Region 4 ESC issued a request for quotation for TCPN Solicitation Number 15-17. *Id.* ¶ 21. In mid-June 2015, CCD, hoping to market its new unit price book to TCPN for this solicitation, hired Counter-Defendant Stack as a consultant to provide the necessary data. *Id.* ¶¶ 19, 21. In developing the new unit price book, Stack used data he had maintained and developed based on a publicly available unit price book the U.S. Army Corps of Engineers had created. *Id.* ¶ 20. The new unit price book was named the "Construction Cost Catalogue." *Id.*

On June 1, 2015, JOC Group and KATA Management, LLC ("KATA Management") entered into a contract under which JOC Group would provide business support to KATA Management on projects with TCPN for a period of five years. *Id.* ¶ 22. Under the terms of the contract, JOC Group was to, among other things, provide the Construction Cost Catalogue and estimating software for the projects through CCD. *Id.*

On July 23, 2015, CCD and 4Clicks Solutions, LLC ("4Clicks Solutions") entered into a contract providing that 4Clicks Solutions would incorporate the Construction Cost Catalogue's data into estimating software for bidding purposes. *Id.* ¶ 23.

On August 6, 2015, Region 4 ESC began seeking bids for TCPN Solicitation Number 15-17, with a September 1, 2015 due date. *Id.* ¶ 24. After learning that TCPN would allow contractors to submit bids using the Construction Cost Catalogue, rather than requiring that the bids be based solely on Defendants' unit price book, Defendants sent a cease-and-desist letter to

Plaintiffs. *Id.* ¶ 25. That letter, dated September 1, 2015, "alleged without justification that the use of the [Construction Cost Catalogue] was 'a misuse of R.S. Means' proprietary information, as well as an infringement upon R.S. Means' copyrights and trademarks,'" and "specifically referenced the publication and distribution of [the Construction Cost Catalogue] in connection with TCPN Solicitation Number 15-17." *Id.* Defendants also "alleged that CCD attempted to cause confusion in the marketplace by selling a product with a title similar to" Gordian's unit price book, which was called the "Construction Task Catalog." *Id.* ¶¶ 14, 25.

Defendants then sought to have JOC Group removed as a contractor on all TCPN projects. *Id.* ¶ 26. On September 3, 2015, Defendants sent a cease-and-desist letter to TCPN, stating that Plaintiffs were improperly using Defendants' proprietary material and intellectual property in the Construction Cost Catalogue. That letter also demanded that TCPN immediately remove the Construction Cost Catalogue from use in TCPN's bid process and that TCPN extend Solicitation Number 15-17 by two weeks "to allow a resolution with Plaintiffs." *Id.* ¶ 27. On or about September 3, 2015, Region 4 ESC extended the bid deadline for TCPN Solicitation Number 15-17 to September 22, 2015. *Id.* ¶ 28.

On September 11, 2015, Defendants "demanded that Plaintiffs cease all production, marketing, sales, and distribution of the [Construction Cost Catalogue] as well as their use and return of all alleged proprietary data and documentation related to Defendants' products and copyrights." *Id.* ¶ 29. To avoid the threatened legal action and resolve the dispute, CCD agreed to cease marketing the Construction Cost Catalogue, but it demanded that Defendants provide "sufficient evidence showing the alleged copied material." *Id.* ¶ 30. Defendants failed to provide "any evidence establishing the basis for their claims." *Id.* As a result, Plaintiffs were unable to dispel Defendants' allegations concerning ownership of the Construction Cost Catalogue, TCPN

was forced to use Defendants' unit price book, and JOC Group was unable to perform under its contract with KATA Management. *Id.*

In September 2015, Defendants also began threatening to take legal action against 4Clicks Solutions if it did not terminate its contact with CCD. *Id.* ¶ 26. In addition, Gordian began publicly "alleging that Plaintiffs did not have ownership rights to the material in the [Construction Cost Catalogue]." *Id.* On October 14, 2015, 4Clicks Solutions informed CCD that it would terminate their contract unless CCD cleared "the cloud of legal uncertainty" arising from Defendants' claims within twenty days. *Id.* ¶ 31. When Plaintiffs were unable to do so, 4Clicks Solutions terminated the contract effective October 1, 2015. *Id.* Around the same time, KATA Management informed JOC Group that it would terminate its contract based on Defendants' claims. *Id.* ¶ 32. Sometime in October 2015, Defendants registered their copyright to the information they claimed Plaintiffs had misappropriated. *Id.* ¶ 27. On February 3, 2016, TCPN informed JOC Group that it intended to recommend that Region 4 ESC not renew its contract for JOC Group's estimating services after June 30, 2016. *Id.* ¶ 33.

Plaintiffs allege that Defendants used their "monopoly power," made false allegations about ownership rights, sent demand letters to Plaintiffs' customers, and required vendors to stop using the Construction Cost Catalogue—all in an effort to prevent Plaintiffs from entering the unit price book market "in Texas and elsewhere." *Id.* ¶ 37. To control the market for job order contracting "management programs," Defendants allegedly mandated that their management program be used in connection with their unit price book. *Id.* ¶ 38. The result, Plaintiffs claim, is that contractors must "pay whatever price Defendants determine in order to participate in [job order contracting] projects." *Id.*

Plaintiffs set forth two categories of claims under Texas state law. First, they sue under several business tort theories, claiming that Defendants: (1) tortiously interfered with (a) the contract between 4Clicks Solutions and CCD and (b) the contract between KATA Management and the JOC Group, *id.* ¶¶ 56–60; (2) conspired to interfere with those contracts, *id.* ¶¶ 67–68; (3) tortiously interfered with the prospective and/or advantageous commercial relationships between (a) Plaintiffs and 4Clicks Solutions and (b) Plaintiffs and KATA Management, *id.* ¶¶ 61–66; and (4) maliciously published "disparaging" and "false" oral and written statements about Plaintiffs' business and Plaintiffs' ownership rights to the material in the Construction Cost Catalogue, *id.* ¶¶ 69–74. Second, Plaintiffs claim that Defendants monopolized and/or attempted to monopolize "the Texas market" for unit price books, in violation of the Texas Free Enterprise and Antitrust Act, TEX. BUS. & COM. CODE § 15.05(b). *Id.* ¶¶ 39–55.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint, or any portion of a complaint, for "failure to state a claim upon which relief can be granted." "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "[A] complaint must be liberally construed in favor of the plaintiff, and all well-pleaded facts must be taken as true," but "[l]egal conclusions are not entitled to the assumption of truth." *Duke Energy Intern., L.L.C. v. Napoli*,

748 F. Supp. 2d 656, 665 (S.D. Tex. 2010) (Atlas, J.) (internal quotation marks and citations omitted). "[T]he burden is on the moving party to prove that no legally cognizable claim for relief exists." 5B Charles Alan Wright et al., *Federal Practice & Procedure* § 1357 (3d ed. 2017); *accord In re Paracelsus Corp.*, 6 F. Supp. 2d 626, 630 (S.D. Tex. 1998) (Werlein, J.) ("under Rule 12(b)(6), the defendant bears the burden of proving that no relief could be granted"). "Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted).

## III. DISCUSSION

### A. Plaintiffs' Business Tort Claims Should Not Be Dismissed

Defendants move to dismiss all of Plaintiffs' business tort claims, arguing that those claims are based on Defendants' "pre-litigation correspondence with Plaintiffs and TCPN" and therefore barred under the *Noerr-Pennington* doctrine. Mot. Dismiss 7–12. Defendants' reliance on the *Noerr-Pennington* doctrine to support their motion to dismiss is misplaced.[3]

#### 1. The *Noerr-Pennington* Defense

The *Noerr-Pennington* doctrine protects private parties from liability for petitioning the government (including the courts) to take action favorable to them, even when such petitioning is motivated by anticompetitive intent. *California Motor Transp. Co. v. Trucking Unlimited*, 404

---

[3] Defendants do not challenge Plaintiffs' business tort claims on any other grounds. Nonetheless, the Court observes that Plaintiffs' claim that Gordian and R.S. Means conspired to "cause the breach of contract that resulted in [P]laintiffs' damages," Am. Compl. ¶ 68, would likely not withstand 12(b)(6) scrutiny. Under Texas law, "[t]he essential elements of a civil conspiracy claim are: 1) two or more persons; 2) an object to be accomplished; 3) a meeting of the minds on the object or course of action; 4) one or more unlawful, overt acts; and 5) damages as the proximate result." *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 404–05 (5th Cir. 2013) (citing *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996)). Plaintiffs have not alleged sufficient factual matter to support all of these elements. In addition, Plaintiffs vaguely allege that Gordian "acquired" R.S. Means in July of 2014. Am. Compl. ¶ 15. It is not apparent that Texas law would permit a civil conspiracy claim in light of that acquisition. *See Grizzle v. Tex. Commerce Bank, N.A.*, 38 S.W.3d 265, 284 (Tex. App.—Dallas 2001) (acknowledging split among Texas courts of appeals on whether a parent corporation can civilly conspire with its wholly-owned subsidiary), *rev'd in part on other grounds*, 96 S.W.3d 240 (Tex. 2002).

U.S. 508, 510–11 (1972); *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988). "Although the *Noerr-Pennington* doctrine initially arose in the antitrust field," courts—the Fifth Circuit and Texas state courts included—"have expanded it to protect first amendment petitioning of the government from claims brought under federal and state laws, including . . . common-law tortious interference with contractual relations." *Video Int'l*, 858 F.2d at 1084 (citations omitted) ("There is simply no reason that a common-law tort doctrine can any more permissibly abridge or chill the constitutional right of petition than can a statutory claim such as antitrust."); *accord RRR Farms, Ltd. v. Am. Horse Prot. Ass'n, Inc.*, 957 S.W.2d 121, 126–31 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (applying doctrine to Texas state-law tort claims); *Profinity, LLC v. One Techs., L.P.*, No. 05-14-00403-CV, 2015 WL 9257025, at *13–15 (Tex. App.—Dallas Dec. 17, 2015, no pet.) (applying doctrine to claim under Texas antitrust statute).

Courts have further broadened the doctrine to protect "those acts reasonably and normally attendant upon effective litigation," including threats to litigate, such as cease-and-desist letters. *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983); *accord Source Network Sales & Mktg., LLC v. Ningbo Desa Elec. Mfg. Co.*, No. 3:14-CV-1108-G, 2015 WL 2341063, at *8 (N.D. Tex. May 15, 2015); *Long Canyon Phase II & III Homeowners Ass'n, Inc. v. Cashion*, No. 03-15-00498-CV, 2017 WL 875314, at *5 & n.32 (Tex. App.—Austin Mar. 3, 2017, no pet. h.) ("[P]resuit demand letters generally fall within the 'right to petition.'").

There is an exception to the *Noerr-Pennington* doctrine: it does not protect "sham" litigation. *Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 690 (5th Cir. 2010); *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 861 (5th Cir. 2000) ("The [Supreme] Court has allowed only one exception to the *Noerr-Pennington* doctrine—the 'sham' exception." (citing *Omni Outdoor*

*Advert., Inc.*, 499 U.S. 365, 380 (1991))); *see also Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743 (1983) ("Baseless litigation is not immunized by the First Amendment right to petition."). Consequently, the doctrine also does not protect pre-litigation activities where the threatened lawsuit is a sham. *Coastal States Mktg.*, 694 F.2d at 1367–69 ("***If litigation is in good faith***, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute." (emphasis added)); *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 351 (9th Cir. 2014).

The Supreme Court has crafted a two-part inquiry for determining whether the "sham exception" applies to a given lawsuit. *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). First, "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized." *Id.* Only if the challenged litigation is "objectively meritless" may a court proceed to the second part of the inquiry, which entails examining the litigant's subjective motivation to determine "whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process." *Id.* at 60–61 (emphases in original) (citations, internal quotations marks, and brackets omitted); *accord Bryant*, 597 F.3d at 690. Where a pre-litigation cease-and-desist letter is concerned, courts follow this framework by "first assess[ing] the merits of the threatened litigation underlying the cease and desist letter and, if they are objectively lacking, . . . then assess[ing] [the sender's] subjective motivation in sending the letter." *Wolf v. Cowgirl Tuff Co.*, No. 1:15-CV-1195, 2016 WL 4597638, at *9 & n.7 (W.D. Tex. Sept. 2, 2016).

## 2. The *Noerr-Pennington* Defense Does Not Warrant Dismissal

Defendants contend that Plaintiffs' business tort claims must be dismissed on *Noerr-Pennington* grounds because Plaintiffs "cannot meet the heavy burden of establishing" that: (1) "the cease-and-desist correspondence was objectively baseless" and (2) Defendants' "subjective intent in sending the letters was to interfere with business opportunities." Mot. Dismiss 11; *see also* Defs.' Reply 4, ECF No. 51 (asserting that "Plaintiffs cannot satisfy the heightened standard" for establishing the sham exception to *Noerr-Pennington*).

### a. Plaintiffs need not plead against an affirmative defense

Defendants' argument relies on the premise that Plaintiffs were required to plead against the *Noerr-Pennington* defense and/or affirmatively plead the sham litigation exception to that defense. That premise is mistaken. The *Noerr-Pennington* doctrine functions as an affirmative defense. *Bayou Fleet*, 234 F.3d at 860; *Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287, 295 (5th Cir. 2000) ("[T]he *Noerr-Pennington* doctrine . . . provides only a defense to liability, not an immunity from suit." (citations omitted)). As such, it "authorizes dismissal through a Rule 12(b)(6) motion only when its applicability appears on the face of the pleadings." *Source Network*, 2015 WL 2341063, at *11 (citation, internal quotation marks, and ellipsis omitted); *see also Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 726 (5th Cir. 2013); *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986) ("[A] claim may . . . be dismissed if a successful affirmative defense appears clearly on the face of the pleadings.").

Crucially, a plaintiff "is under no obligation to plead against a possible affirmative defense or the possible exceptions to an affirmative defense." *River Capital Advisors of N. Carolina, Inc. v. FCS Advisors, Inc.*, No. 4:10-cv-471, 2011 WL 831282, at *9 (E.D. Tex. Feb. 7, 2011), *adopted*, 2011 WL 831186 (E.D. Tex. Mar. 3, 2011); *accord Jaso v. The Coca Cola Co.*,

435 F. App'x 346, 351 (5th Cir. 2011) (per curiam) (unpublished opinion) ("A plaintiff typically is not required to plead, in the complaint, facts that negate an affirmative defense."); *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Complaints need not contain *any* information about defenses and may not be dismissed for that omission."); *see also* FED. R. CIV. P. 8(c)(1) (providing that the party "responding to a pleading" must "affirmatively state any . . . affirmative defense"). As other courts have stated, the *Noerr-Pennington* defense is "typically only 'properly analyzed through a consideration of evidence outside of the pleadings and as such, [is usually] not appropriately considered in [a] Rule 12(b)(6) context." *Wolf*, 2016 WL 4597638, at *9 (ellipsis omitted) (quoting *Morrone Co. v. Barbour*, 241 F. Supp. 2d 683, 690 (S.D. Miss. 2002) (denying motion to dismiss based on *Noerr-Pennington*)); *accord Eon Corp. IP Holdings, LLC v. Landis+Gyr Inc.*, No. 611-cv-00317, 2013 WL 12040726, at *5 (E.D. Tex. May 17, 2013) (finding "resolution of the applicability of *Noerr-Pennington* doctrine inappropriate for a 12(b)(6) determination"), *adopted*, 2013 WL 12044954 (E.D. Tex. July 30, 2013).

### b. Dismissal is appropriate only when the complaint forecloses any potential response to an affirmative defense

Only when a plaintiff "pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Xechem*, 372 F.3d at 901. As the Fifth Circuit has explained:

> [B]ecause an adequately stated claim may be supported by showing *any set of facts* consistent with the allegations in the complaint, dismissal for failure to state a claim based on [an affirmative] defense should be granted only when the plaintiff's potential rejoinder to the affirmative defense [is] foreclosed by the allegations in the complaint.

*Jaso*, 435 F. App'x at 352 (internal quotation marks and citations omitted) (emphasis in original) (quoting *Goodman v. Praxair, Inc.*, 494 F.3d 458, 466 (4th Cir. 2007) (en banc)); *see also EPCO*

*Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 469–71 (5th Cir. 2006) (dismissal at 12(b)(6) stage was improper because plaintiff was not "foreclosed by the face of [its] pleadings" from showing factual scenarios under which it satisfied statute-of-frauds-like provision that operated as an affirmative defense).

This is an exacting rule: if the sham litigation exception "is not foreclosed by the allegations in the complaint," a motion to dismiss based on the *Noerr-Pennington* defense must be denied. *Wolf*, 2016 WL 4597638, at *9 & n.7 (citations and internal quotation marks omitted); *Jaso*, 435 F. App'x at 352.[4]

### c. Plaintiffs' amended complaint does not foreclose the sham litigation exception

Applying the proper rule, the Court concludes that Defendants' argument for dismissal on *Noerr-Pennington* grounds is without merit. Nothing on the face of the amended complaint "forecloses the possibility" that Defendants' pre-litigation activities fall within the sham exception to the *Noerr-Pennington* defense.[5] *See Wolf*, 2016 WL 4597638, at *9; *Jaso*, 435 F.

---

[4] Defendants cite *Love Terminal Partners, L.P. v. City of Dallas*, 527 F. Supp. 2d 538 (N.D. Tex. 2007). There, a court granted a motion to dismiss on *Noerr-Pennington* grounds, finding the sham exception inapplicable because the complaint "fail[ed] to allege facts that would support [that] exception." *Id.* at 552 n.7. Some other courts have also stated that plaintiffs must plead facts plausibly supporting the sham exception in order to avoid Rule 12(b)(6) dismissal on *Noerr-Pennington* grounds. *E.g.*, *Sweet St. Deserts, Inc. v. Chudleigh's Ltd.*, No. 12-3363, 2013 WL 1389760, at *7 (E.D. Pa. Apr. 4, 2013) ("Plaintiff must sufficiently plead, therefore, that the demand letter was both 'objectively baseless' and 'subjectively motivated' by anticompetitive intent."); *Select Comfort Corp. v. Sleep Better Store, LLC*, 838 F. Supp. 2d 889, 899 (D. Minn. 2012) ("the pleadings do not reveal [the] claim [in a demand letter] to be objectively baseless"). These cases cannot be reconciled with the numerous authorities cited above, some of which are binding on this Court and all of which are more persuasive on this issue.

[5] For purposes of the present motion, the Court assumes that the pre-litigation conduct upon which Plaintiffs' business tort claims are based consists entirely of "acts reasonably and normally attendant upon effective litigation." *See Coastal States Mktg.*, 694 F.2d at 1367. It is not clear that this is an accurate assumption, however.

The amended complaint alleges that Defendants took various actions beyond sending the cease-and-desist letter to Plaintiffs. *See, e.g.*, Am. Compl. ¶ 26 (alleging that Gordian "publically [*sic*] criticiz[ed] Plaintiffs by alleging that Plaintiffs did not have ownership rights to the material in the CCD Catalogue"); *id.* ¶ 59 (Defendants "threat[ened] legal action" *and* "publically alleg[ed] that Plaintiffs did not have ownership rights to the material in the CCD Catalogue," which resulted in both 4Clicks Solutions and

App'x at 352. Specifically, the complaint does not contain factual allegations precluding the possibility (1) that the litigation Defendants threatened to pursue was objectively baseless, or (2) that Defendants were subjectively motivated to threaten such litigation as a means of directly interfering with Plaintiffs' business relationships through the litigation process itself. *See GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F. Supp. 2d 712, 742 (N.D. Tex. 2010) (denying summary judgment for party asserting *Noerr-Pennington* defense because it failed to demonstrate that "the sham exception cannot apply in this case"). Accordingly, Plaintiffs may be able to show, consistent with the allegations in the amended complaint, that the sham exception applies.

---

KATA Management terminating their agreements with Plaintiffs); *id.* ¶ 70 ("Defendants published disparaging statements, ***both orally and written***, about Plaintiffs' ownership rights to the material in the CCD Catalogue. Defendants stated Plaintiffs did not have ownership rights to the material in the CCD Catalogue . . . . " (emphasis added)). It is not readily apparent that these actions were "reasonably and normally attendant upon effective litigation," at least insofar as they were directed to Plaintiffs' customers and business partners or other third parties and were not sufficiently tied to the threatened litigation. *See Wolf*, 2016 WL 4597638, at *8 n.6 (refusing to decide, at 12(b)(6) stage, whether defendant's "direct communications with [plaintiff's client] encouraging [the client] not to work with [p]laintiffs should be considered acts reasonably attendant upon litigation and immunized under *Noerr-Pennington*"); *Luxpro Corp. v. Apple, Inc.*, 658 F. Supp. 2d 921, 929 (W.D. Ark. 2009) (denying 12(b)(6) motion where defendant had not shown that its "post-litigation conduct of sending warning letters, making threats, and exerting pressure on [plaintiff's] clients [was] incidental to the prosecution of the . . . litigation . . . [or] was in anyway related to its right to petition a court"); *Laitram Mach., Inc. v. Carnitech A/S*, 901 F. Supp. 1155, 1161 (E.D. La. 1995) ("The *Noerr-Pennington* doctrine does not extend to sending letters to a competitor's ***customers*** alleging violation of trade secrets and infringement of patents." (emphasis added)); *cf. Coastal States Mktg.*, 694 F.2d at 1367–68 & n.30 (threats to actually litigate against a competitor's customers are not "*per se* unprotected"); *Matsushita Elecs. Corp. v. Loral Corp.*, 974 F. Supp. 345, 359 (S.D.N.Y. 1997) (holding that demand letters sent to defendants on day suit was filed, and letters sent thereafter to non-litigant companies as part of a "reasonable attempt to determine whether it should join those companies as defendants," were "reasonably attendant upon effective litigation"). To the extent they were not, those actions lie outside the limits of the *Noerr-Pennington* defense, regardless of the sham litigation exception.

The Court's recommendation that Defendants' motion be denied in light of the sham exception makes further consideration of this issue unnecessary at this stage. *See Wolf*, 2016 WL 4597638, at *8 n.6. Further development of the facts may add clarity or obviate the question entirely.

### d. Defendants' exhibits do not establish a *Noerr-Pennington* defense for purposes of Rule 12(b)(6) dismissal

Defendants attached the following three exhibits to their motion to dismiss and assert that those documents establish their *Noerr-Pennington* defense: (1) the declaration of Scott Smith, who is Gordian's vice president and general manager, as well as the "head of enterprise solutions" for Gordian and R.S. Means, ECF No. 49-1; (2) the cease-and-desist letter Defendants sent to Plaintiffs on September 1, 2015, ECF No. 49-2; and (3) the cease-and-desist letter Defendants sent to TCPN on September 3, 2015, ECF No. 49-3. When ruling on a motion to dismiss under Rule 12(b)(6), a court's analysis is "limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). Smith's declaration, which falls into none of those categories, is "well beyond the scope of what may properly be considered, and will be disregarded as such." *Jaber v. Metro. Transit Auth.*, No. 4:14-CV-201, 2014 WL 4102120, at *3 (S.D. Tex. Aug. 14, 2014) (Harmon, J.).[6] The two cease-and-desist letters, on the other hand, are properly before the Court: Plaintiffs do not dispute the authenticity of those letters, *see Brock v. Baskin-Robbins USA Co.*, 113 F. Supp. 2d 1078, 1092 (E.D. Tex. 2000), they are central to Plaintiffs' claims, and Plaintiffs refer to (and even quote) them in their complaint. *See* Am. Compl. ¶¶ 25, 27; *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

The letter dated September 1, 2015 is from Jeffrey A. Cohen, an attorney representing Gordian and R.S. Means, and addressed to Ben Stack/All Cost Data and Mark Powell/CCD/JOC

---

[6] The Court does not find it appropriate to convert Defendants' 12(b)(6) motion into one for summary judgment. *See Harris v. Coastal Offshore, Inc.*, No. 2:11-cv-58, 2011 WL 2457922, at *3–4 (S.D. Tex. June 16, 2011) (Jack, J.).

Group/MJS with the subject line "Re: Construction Cost Catalogue—Demand to Immediately Cease and Desist Use of Catalogue and All Data Contained Therein." The body of the letter reads:

> It has come to The Gordian Entities' [i.e., Gordian and R.S. Means] attention that [All Cost Data] and [CCD], as well as its subsidiaries and partners (including, but not limited to [JOC Group] and [MJS]) . . . are improperly using the proprietary material and intellectual property of The Gordian Entities in CCD's[7] 2015 Construction Cost Catalogue publication, as well as on the website www.allcostdata.info, which is owned and maintained by Mr. Stack and [All Cost Data].
>
> As you are both aware, Mr. Stack worked for U.S. Cost from 1996 to 2012, performing tasks including software development for construction cost estimation using the proprietary construction cost data provided to U.S. Cost, among others, including, but not limited to, the compilations of RSMeans [*sic*] data licensed to U.S. Cost and other third parties. The construction cost data was provided by RS Means to U.S. Cost subject to a license agreement, which included restriction on the use and distribution of the proprietary construction cost data. Upon Mr. Stack's departure from U.S. Cost, or at some time during his tenure there, Mr. Stack appears to have taken this proprietary information for use through the website www.allcostdata.info and in CCD's 2015 Construction Cost Catalogue.
>
> As we further know, [JOC Group], including Mr. Powell, is the owner of CCD and a primary contributing source to the Construction Cost Catalogue and, therefore, the information provided to this catalogue by Mr. Powell is a misuse of RSMeans' proprietary information, as well as an infringement upon RS Means' copyrights and trademarks.
>
> The Gordian Entities also note that CCD has attempted to cause confusion in the marketplace by selling a product that not only contains the proprietary information of RS Means, but also, not coincidentally, has a title confusingly similar to products sold by RS Means' parent company, [Gordian]. CCD's published work is titled "Construction Cost Catalogue," while [Gordian]'s much more established published work is titled "Construction Task Catalog®" which is a registered trademark of [Gordian].
>
> In light of the above, it is clear that [All Cost Data], CCD and its subsidiaries and related companies have (1) infringed on RSMeans and [Gordian]'s copyrights and trademarks, (2) misappropriated and misused the proprietary information of RS Means, and (3) intentionally caused unfair competition in the marketplace. These improper acts appear to be continuing at present with the publication and

---

[7] The letter designates "CCD" as collectively referring to All Cost Data, CCD, JOC Group, and MJS, but also appears to use "CCD" to mean Construction Cost Data, LLC alone.

distribution of the Construction Cost Catalogue in connection with TCPN Solicitation Number 15-17 for Job Order Contract Services.

RSMeans and [Gordian] have suffered damage and continue to suffer additional damage with each day that CCD and All Cost Data Info improperly use the proprietary data of RSMeans. As such, RSMeans and [Gordian] demand that All Cost Data Info, CCD, all subsidiaries and affiliated companies, and all individuals associated with these entities, immediately:

- Cease and desist use of the Construction Cost Catalogue and all of RSMeans' proprietary data and copyrighted material contained therein;
- Cease and desist the use of RSMeans' proprietary data and copyrighted material on the website www.allcostdata.info;
- Return all proprietary data of RSMeans;
- Advise TCPN that the Construction Cost Catalogue shall not be available for use in TCPN's Job Order Contracts awarded pursuant to Solicitation Number 15-17;
- Remove all copies [of] the Construction Cost Catalogue from avenues of commerce;
- Cease use of the title "Construction Cost Catalogue";
- Remove all infringing data and documentation from any affiliated websites, including, but not limited to, www.allcostdata.info, www.constructioncostdata.us, www.thejocgroup.com, and any other affiliated websites; and
- Confirm that All Cost Data Info, CCD, all subsidiaries and affiliated companies, and all individuals associated with these entities, will not use any of RSMeans' construction cost data without the express written consent and license from RSMeans.

RS Means and [Gordian] demand that you provide written assurance of the above no later than September 2, 2015 at 5:00 pm Eastern Time. If you do not do so by the aforementioned date and time, we will immediately seek to have the courts restrain you for the activities referenced above, as well as seeking substantial money damages including, but not limited to, those related to RSMeans' lost sales and opportunities, disgorgement of your profits, attorneys' fees and costs of suit.

*     *     *

The September 3, 2015 letter is from the same law firm and addressed to "Stuart Verdon, Director, TCPN Facilities Solutions"/TCPN Management Group LLC with the subject line "Re: Request for TCPN to Immediately Cease and Desist Use of Construction Cost Data, LLC's

Construction Cost Catalogue in Project Bidding." The letter contains the exact same first paragraph as the September 1 letter and reads:

> As a result of CCD's misappropriation of The Gordian Entities' proprietary data compilations and infringement on The Gordian Entities' copyrights, on September 1, 2015, The Gordian Entities served a cease and desist letter on all related individuals and entities. In addition to demanding they cease using, selling and marketing the Construction Cost Catalogue, The Gordian Entities has [*sic*] demanded they immediately withdraw the Construction Cost Catalogue from the market, including its use with TCPN.
>
> It is our understanding that TCPN has a deadline of September 8, 2015 for the submission of bids, and that the bids can rely upon The Gordian Entities' catalogs and data or the Construction Cost Catalogue. We ask that TCPN immediately remove the Construction Cost Catalogue from use in TCPN's bid process and/or extend the deadline for a reasonable period of two weeks while we attempt to resolve this dispute with CCD. We also ask that you provide us with notice of your intent to do so by 3:00 pm Eastern Time today or we will be proceeding with an application for a restraining order without further notice as early as this afternoon.

*       *       *

As with the amended complaint itself, these letters do not foreclose either prong of the sham litigation exception (i.e., objective baselessness and improper subjective motivation) and therefore fail to establish Defendants' affirmative defense under *Noerr-Pennington* for purposes of dismissal under Rule 12(b)(6). Defendants maintain that the letters "set forth [their] good faith belief that their intellectual property rights were being infringed by the Plaintiffs." Defs.' Reply 4. In appropriate circumstances, *Noerr-Pennington* immunity can apply to owners' good faith "attempts to protect their intellectual property rights." *GoForIt Ent.*, 750 F. Supp. 2d at 742. But for 12(b)(6) purposes, the cease-and-desist letters themselves establish, at most, that Defendants made the assertions contained in those letters, not that Defendants made those assertions *in good faith*. *See Sweet St. Deserts, Inc. v. Chudleigh's Ltd.*, No. 12-3363, 2013 WL 1389760, at *2, 7 (E.D. Pa. Apr. 4, 2013) (denying motion to dismiss on *Noerr-Pennington* grounds, even though

demand letter claimed infringement of trademark registered with Patent and Trademark Office).[8] Whether the letters were objectively baseless and sent with an impermissible subjective motivation can only be analyzed based on further evidence not properly before the Court at this stage. *See Wolf*, 2016 WL 4597638, at \*9; *Morrone*, 241 F. Supp. 2d at 690.

In a similar vein, Defendants assert that the sham exception cannot apply here because sending the letters was "not only objectively reasonable but mandatory in order to protect their intellectual property rights." Mot. Dismiss 11; *see Sweet St. Deserts*, 2013 WL 1389760, at \*6 (noting that trademark registrants are generally "barred from recovering profits or damages if they do not notify the infringing party of the alleged infringement prior to filing their complaint" (citing 15 U.S.C. § 1111)). But this argument begs the question: if the threatened litigation was a sham, then the letters were *not* calculated to protect Defendants' intellectual property rights. *See C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1368 (Fed. Cir. 1998) (*Noerr-Pennington* does not apply when a litigant "bring[s] suit to enforce a patent with knowledge that the patent is invalid or not infringed, and the litigation is conducted for anti-competitive purposes.").

An examination of the legal claims Defendants threatened to pursue in the September 1 letter confirms that Plaintiffs are not foreclosed from successfully establishing the sham exception. (This examination focuses on the "objectively baseless" prong, but the subjective prong remains viable as well for the reasons stated above.)

---

[8]  This case is unlike those where courts have found that an exhibit, on its face, "directly refute[s]" a crucial allegation made in the complaint. *See Sheppard v. Tex. Dep't of Transp.*, 158 F.R.D. 592, 597–98 (E.D. Tex. 1994) (granting motion to dismiss where plaintiff alleged he had received a right-to-sue letter but exhibit showed that the letter was not a right-to-sue letter); *Case v. State Farm Mut. Auto. Ins. Co.*, 294 F.2d 676, 676–78 (5th Cir. 1961) (district court properly dismissed plaintiff's claim that defendant wrongfully terminated contract because terms of the contract, which was attached to the complaint, gave defendant the right to terminate the agreement with or without cause).

### i. Plaintiffs may be able to show that Defendants' threat to pursue a trademark infringement claim was objectively baseless

To begin, that letter alleged that Plaintiffs' Construction Cost Catalogue unlawfully infringed on Defendants' trademark in the "Construction Task Catalog®." "To succeed in a trademark infringement claim, a party must first show that it has a protectable right in the mark and, second, show that there is a likelihood of confusion between the marks." *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008) (per curiam) (citing *Security Ctr., Ltd. v. First Nat'l Security Ctrs.*, 750 F.2d 1295, 1298 (5th Cir. 1985)).

> In determining whether a likelihood of confusion exists, [courts] considers the following nonexhaustive list of factors: (1) the type of trademark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion. No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these "digits of confusion." This Court has also added "[a]n eighth factor, the degree of care employed by consumers."

*Paulsson Geophysical Servs.*, 529 F.3d at 310 (citations omitted); *accord Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998) ("In addition to the listed factors, a court is free to consider other relevant factors in determining whether a likelihood of confusion exists.").

While Gordian has a protectable trademark right in the Construction Task Catalog,[9] the letter does not foreclose Plaintiffs from showing that a reasonable litigant could not have expected to succeed in showing a likelihood of confusion between it and Plaintiffs' unit price book. The letter's various assertions—e.g., that Stack and Powell misappropriated Defendants' construction cost data and that "CCD has attempted to cause confusion in the marketplace by

---

[9] The letter's mere assertion that the Construction Task Catalog was "a registered trademark" of Gordian does not establish this fact. Rather, the Court takes judicial notice of the official trademark registration documents attached to Defendants' Second Amended Counterclaims. ECF No. 29-2; *see Norris v. Hearst Trust*, 500 F.3d 454, 461 n.6 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record.").

selling a product that . . . contains the proprietary information of RS Means"—establish only that Defendants made those assertions, not that those assertions were true or that Defendants reasonably believed they were true.[10] *See Prof'l Real Estate Inv'rs*, 508 U.S. at 62–63 ("Probable cause to institute civil proceedings requires . . . a reasonable belief that there is a chance that a claim may be held valid upon adjudication." (internal quotation marks, brackets, and citation omitted)). Further, the Court cannot say, at this stage, that the titles of the two unit price books are, as the letter states, "confusingly similar." *See Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 485–86 (5th Cir. 2004) (emphasizing the importance of context in evaluating the "digits of confusion"). And even if they were, that would not definitively establish, under the multifactor test for "likelihood of confusion," that the trademark infringement litigation Defendants threatened to pursue was not objectively meritless.

### ii. Plaintiffs may be able to show that Defendants' threatened copyright infringement claim was objectively baseless

The September 1 letter claimed copyright infringement as well. "To prove copyright infringement a party must show that '(1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original.'" *Phoenix Ent. Partners LLC v. Boyte*, No. 4:16-cv-2911, 2017 WL 1153969, at *5 (S.D. Tex. Mar. 28, 2017) (Rosenthal, J.) (quoting *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012)). Plaintiffs allege that Defendants did not register their copyright to the information at issue until October 2015—a month after it sent out the cease-and-desist letter claiming copyright infringement—and the Court accepts that allegation as true for present purposes. Am. Compl. ¶ 27; ECF No. 29-1 (U.S. Copyright Office certificate of registration for "RSMeans 2008 Data Compilation" dated October

---

[10]   Nor does it directly refute, for 12(b)(6) purposes, Plaintiffs' allegation that the Construction Cost Catalog was based on data from a publicly available unit price book the U.S. Army Corps of Engineers created. *See* Am. Compl. ¶ 20.

5, 2015); *see also Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004) (per

curiam) ("A certificate of registration, if timely obtained, is prima facie evidence both that a

copyright is valid and that the registrant owns the copyright.").[11]

To establish the second element of a copyright infringement claim, a plaintiff must make

two showings. "First, the plaintiff must, as a factual matter, prove that the defendant actually

used the copyrighted material to create [the defendant's] own work." *Id.* (internal quotation

marks and citation omitted); *see also id.* at 142 ("In some cases, factual copying may be proven

without a showing of access if the two works are so strikingly similar as to preclude the

possibility of independent creation." (internal quotation marks, brackets, and citation omitted)).

Second, because "not all copying is legally actionable," a plaintiff must show that the alleged

copy "bear[s] a substantial similarity to the protected aspects of the original." *1 Peel & Co. v.

The Rug Market*, 238 F.3d 391, 398 (5th Cir. 2001). "[A] side-by-side comparison must be made

between the original and the copy to determine whether a layman would view the two works as

'substantially similar.'" *Gen. Universal Sys.*, 379 F.3d at 142 (citation omitted). Here, the

September 1 letter does not foreclose Plaintiffs from demonstrating the objective baselessness of

Defendants' threatened copyright infringement claim with respect to either actual copying or

substantial similarity.

### iii. Plaintiffs may be able to show that Defendants' threatened claims for misappropriation and unfair competition were objectively baseless

The September 1 letter also threatened claims for misappropriation and misuse of

proprietary information and for unfair competition. Those claims require a plaintiff to show,

among other things, that *its* proprietary information or product was used in an impermissible

---

[11] While the October 2015 registration occurred after Defendants sent the cease-and-desist letters, "registration is not required to obtain copyright protection, *see* 17 U.S.C. § 408(a), [although] it is a prerequisite to bringing an infringement action in federal court, *see* [17 U.S.C.] § 411(a)." *BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 503 (S.D.N.Y. 2015).

way. *See Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003) (misappropriation of trade secrets claim requires proof of "(1) the existence of a trade secret; (2) a breach of a confidential relationship or improper discovery of the trade secret; and (3) use of the trade secret without authorization."); *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 845 F.3d 652, 657 n.7 (5th Cir. 2017) ("The elements of Texas's unfair competition by misappropriation are: (1) the creation by a plaintiff of a product through extensive time, labor, skill, and money; (2) the use of that product by defendant in competition with plaintiff; and (3) commercial damage to the plaintiff."). As already explained, the letter does not establish, for 12(b)(6) purposes, that Stack or Powell misappropriated Defendants' construction cost data. It therefore does not foreclose Plaintiffs from showing the objective baselessness of these claims.

### 3. Conclusion

In sum, Defendants' motion should be denied insofar as it seeks dismissal of Plaintiffs' business tort claims based on the *Noerr-Pennington* affirmative defense. "[A] responding party often imposes an undue burden on the trial court and impedes the orderly administration of the lawsuit when [it] relies on a motion to dismiss to raise such an affirmative defense." *Richards v. Mileski*, 662 F.2d 65, 73 (D.C. Cir. 1981).

## B. Plaintiff's Antitrust Claims Should Not Be Dismissed

The Texas Free Enterprise and Antitrust Act ("TFEAA") provides that "[i]t is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." TEX. BUS. & COM. CODE § 15.05(b). Defendants move to dismiss Plaintiffs' claims for monopolization and attempted monopolization under this provision, arguing that "Plaintiffs cannot rely on [Defendants'] pre-litigation correspondence which is immunized by the *Noerr-Pennington* [d]octrine" and that when the allegations related to that correspondence are

excluded, all that remains are "wildly speculative assertions and legal conclusions that are not supported by any factual allegations." Mot. Dismiss 12–14. Because Defendants have failed to establish their *Noerr-Pennington* defense under Rule 12(b)(6), the Court will not exclude the amended complaint's allegations concerning the pre-litigation correspondence from consideration.

Defendants next contend that, regardless of the *Noerr-Pennington* defense, "there is no evidence, let alone any appropriately and specifically detailed facts pled in the First Amended Complaint, to allow Plaintiffs to proceed with [the monopolization and attempted monopolization] claims." *Id.* 13. Before turning to each claim, it bears emphasizing that "[a]ntitrust claims do not necessitate a higher pleading standard and a plaintiff need only plead enough facts to state a claim to relief that is plausible on its face." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014) (internal quotation marks and citations omitted); *see also Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) ("[I]n antitrust cases . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.").

### 1. Plaintiffs Have Adequately Stated Their Monopolization Claim

To establish a claim for monopolization under the TFEAA, a plaintiff must prove two elements: (1) "the possession of monopoly power in the relevant market" and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *Caller-Times Pub. Co. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992) (internal quotation marks and citation omitted) (quoting *United States v. I.T.T. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966) (setting forth the elements of the offense of monopolization under § 2 of the Sherman Antitrust

Act, 15 U.S.C. § 2)).[12] Defendants challenge only the first element, which is often analyzed as two interrelated sub-elements: the "relevant market" and "monopoly power" within that market.

### a. Defendants' challenge to Plaintiffs' definition of the "relevant market" is without merit

Defendants appear to attack Plaintiffs' definition of the "relevant market," asserting that "Plaintiffs' allegations have not even properly defined an actual market" and that "Plaintiffs' attempt to designate the parameters of a 'Texas [job order contracting unit price book]' market must be rejected because there simply is no such market." Defs.' Reply 7 (quoting Pls.' Resp. to Mot. Dismiss ¶ 20, ECF No. 50).

As an initial matter, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant . . . market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.); *see also Le v. Zuffa, LLC*, No. 215-cv-01045, 2016 WL 6134520, at *6 (D. Nev. Oct. 19, 2016) ("[S]ince the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." (internal quotation marks omitted) (quoting *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008))). Defendants' perfunctory briefing of this argument makes the Court especially reluctant to entertain it as a basis for dismissal. *See FTC v. Verma Holdings, LLC*, No. 4:13-cv-00594, 2013 WL 4506033, at *7 (S.D. Tex. Aug. 22, 2013) (Atlas, J.) (denying motion to strike affirmative defenses because "[t]he issues surrounding these defenses are inadequately briefed to enable an informed determination about the legal viability of the issues [d]efendants raise");

---

[12] The TFEAA provides that it is to be interpreted "in harmony with federal judicial interpretations of comparable federal antitrust statutes." TEX. BUS. & COM. CODE § 15.04. Courts regularly apply principles developed under federal antitrust law, particularly the Sherman Antitrust Act, to claims brought under the TFEAA. *See In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 708 & n.107 (Tex. 2015); *McPeters v. LexisNexis*, 11 F. Supp. 3d 789, 796–97 (S.D. Tex. 2014) (Ellison, J.).

*Saldana v. Int'l Shipbreaking Ltd.*, No. 1:07-cv-160, 2009 WL 1704274, at *4 (S.D. Tex. June 17, 2009) (Hanen, J.) ("[Defendant] should have provided the Court with authority supporting its claim." (citing *United States v. Stevens*, 487 F.3d 232, 242 n.1 (5th Cir. 2007) ("Inadequately briefed issues are deemed abandoned."))). As Judge Posner has observed, "[i]t is always possible to take pot shots at a market definition." *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1285 (7th Cir. 1990).

Further, even if Defendants had properly briefed this argument, "a relevant market definition is not a necessary component of a monopolization claim." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002) (per curiam) (citations omitted). Specifically, a plaintiff "does not need to define a market if it can support its claim [of monopolization] with direct evidence that the defendant controlled prices or excluded the competition." *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1197 (S.D. Tex. 2009) (Ellison, J.) (collecting cases); *accord Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) ("The Supreme Court has made it clear that there are two ways of proving market power. One is through direct evidence of anticompetitive effects." (citations omitted)). Here, Plaintiffs allege that Defendants used threats of baseless litigation and false accusations about Plaintiffs' business to successfully exclude competition. That is the sort of direct evidence that plausibly supports a monopolization claim, particularly when taken in combination with other allegations in the amended complaint suggesting Defendants' monopoly power (examined below). *See United States v. Microsoft Corp.*, 253 F.3d 34, 56–58, 77–78 (D.C. Cir. 2001) (Microsoft's threats to retaliate against Intel were "direct proof" of monopoly power); *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 971 (10th Cir. 1990) (evidence that health care financing organization's threat to terminate agreement with perceived competitor excluded competition by

inhibiting hospitals from pursuing alternative delivery systems supported finding of monopoly power). Thus, assuming *arguendo* that Defendants' challenge to Plaintiffs' market definition had merit, dismissal at this stage would still not be appropriate since Plaintiffs may succeed on their claims under the direct evidence approach. *Cf. Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510–12 (2002) (holding that plaintiffs in employment discrimination cases need not establish a prima facie case under the *McDonnell Douglas* framework to survive a 12(b)(6) motion to dismiss because that framework is inapplicable if plaintiffs present "direct evidence" of discrimination; it would be "incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered").

Some courts have held that, under the direct evidence approach, plaintiffs must still describe the "rough contours of a relevant market," although they need not make "the usual showing of a precisely defined relevant market." *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004). Plaintiffs in this case have done so. A "relevant market" is a function of "the relevant product market" and "the relevant geographic market." *Wampler v. S.W. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010); *see also Toys "R" Us*, 221 F.3d at 937. Defendants challenge only the "relevant product market." *See MVConnect, LLC v. Recovery Database Network, Inc.*, No. 3:10-cv-1948, 2011 WL 13128799, at *6 (N.D. Tex. May 27, 2011) (not examining the "relevant geographic market" where defendants did not challenge that aspect of plaintiffs' pleadings).[13]

---

[13]   In the Court's view, Defendants' motion to dismiss meaningfully challenges only the "monopoly power" sub-element. *See* Mot. Dismiss 13–14. In their response, however, Plaintiffs argue that Defendants' motion seeks to "re-defin[e] the relevant market presented in Plaintiffs' [amended complaint]" by "deceptively expanding the market to include all services involving construction cost data" rather than just job order contracting unit price books. Pls.' Resp. to Mot. Dismiss ¶¶ 20–21. While that response arguably removes any prejudice Plaintiffs may have incurred with respect to the relevant

"In ascertaining the relevant product market, courts consider the extent to which the seller's product is 'interchangeable in use' and the degree of 'cross-elasticity of demand between the product itself and substitutes for it.'" *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002) (quoting *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1245 (5th Cir. 1985)). "Cross-elasticity of demand" refers to "the extent to which consumers will change their consumption of one product in response to a price change in another." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 (1992). Here, Plaintiffs' amended complaint defines the proposed relevant product market as comprising "job order contracting unit price books." Am. Compl. ¶¶ 36–38, 40–41. Plaintiffs allege that: unit price books are a "major component" of job order contracting projects, *id.* ¶ 7; contractors' bids on job order contracting projects are based on the prices listed in a "pre-determined" unit price book, *id.*; prior to Gordian's acquisition of R.S. Means, vendors had "at least **two** choice for commercial [job

---

*product* market issue, at no point have the parties presented argument regarding the relevant *geographic* market. Even if Defendants' reply could somehow be construed as doing so, Defendants' "failure to raise this argument in [their] opening brief is sufficient to deny it." *Barrash v. Am. Ass'n of Neurological Surgeons, Inc.*, No. 4:13-CV-1054, 2014 WL 357809, at *12 (S.D. Tex. Jan. 31, 2014) (Ellison, J.) (citing *Conway v. United States*, 647 F.3d 228, 237 n.8 (5th Cir. 2011) ("Arguments raised for the first time in a reply brief are forfeited.")); *accord Gillaspy v. Dallas Ind. Sch. Dist.*, 278 F. App'x 307, 315 (5th Cir. May 13, 2008) (unpublished opinion) ("It is the practice of this court and the district courts to refuse to consider arguments raised for the first time in reply briefs." (citations omitted)); *Murthy v. Abbott Labs.*, 847 F. Supp. 2d 958, 977 n.9 (S.D. Tex. 2012) (Ellison, J.) (same).

In any case, the Court concludes that Plaintiffs have plausibly alleged the "rough contours" of a relevant geographic market. A relevant geographic market is "the area in which the defendant effectively competes with other individuals or businesses for the distribution of the relevant product." *Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc.*, 531 F.2d 910, 918 (8th Cir. 1976); *accord Wampler*, 597 F.3d at 744 (the relevant geographic market is defined as "the area of effective competition," which is the "area 'in which the seller operates and to which buyers can practicably turn for supplies'"). The parties agree that Plaintiffs define the relevant geographic market to be "Texas," which is consistent with the repeated references to Texas in the amended complaint. Pls.' Resp. to Mot. Dismiss ¶ 20; Defs.' Reply 7. The allegations that Plaintiffs competed with Defendants in Texas and that vendors and contractors in Texas were unable to find alternatives to Defendants' product before Plaintiffs entered the market or after Plaintiffs left it, Am. Compl. ¶¶ 36–38, plausibly suggest that Texas is the area of effective competition. Although Plaintiffs allude to the national market and other markets, those references are not inconsistent with the existence of a discrete Texas market (or submarket), and there is nothing before the Court to indicate that a localized market for job order contracting unit price books is implausible.

order contracting unit price books]," *id.* ¶ 35, but afterwards "vendors no longer had a readily available alternative [commercial job order contracting unit price book] to use," *id.* ¶ 37; when Defendants came to control "100% of the market" in 2014, they raised prices by about 30%, *id.* ¶ 36; and, following the anticompetitive actions Defendants took against Plaintiffs, "contractors are now forced to use" Defendants' unit price book and must pay "whatever price Defendants determine in order to participate in [job order contracting] projects," *id.* ¶ 38. These allegations support the inference that there are no reasonably interchangeable substitutes for job order contracting unit price books and thus make Plaintiffs' definition of the relevant product market plausible.

Defendants suggest that the relevant product market in this case consists not just of "job order contracting unit price books" but also includes other types of "commercially available construction cost data," such as "estimating guides [that] are not marketed or sold as [job order contracting unit price books]" but which "some consumers" have "adapted for that purpose." Defs.' Reply 7–8. To the extent it occurs, such "adaptation" does not mean that these other products are *reasonably* interchangeable with job order contracting unit price books. *See United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394–95 (1956) (relevant market includes "alternatives that buyers may **readily** use" (emphasis added) and "commodities reasonably interchangeable by consumers for the same purposes"); *Universal Computer Sys., Inc. v. Volvo Cars of N. Am., Inc.*, 207 F.3d 658 (5th Cir. 2000) (per curiam) (unpublished opinion) (product that could be sold outside the purported relevant market "with little or no modification" was "reasonably interchangeable"). Plaintiffs' allegations indicate they are not, and the Court must accept those allegations as true. Also, Defendants themselves state that they "strongly believe that a customized, locally-priced unit price book, developed and published

specifically for [job order contracting]" is "most effective" and that they recommend against consumers adapting estimating guides for use as job order contracting unit price books. Defs.' Reply 7–8. At this stage, the Court cannot say that Plaintiffs' relevant product market definition "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in [P]laintiff[s'] favor." *Apani*, 300 F.3d at 628. Thus, Defendants' motion to dismiss based on Plaintiffs' purported failure to define the relevant market is without merit.

### b. Plaintiffs have plausibly alleged that Defendants possess monopoly power

"Monopoly power is the power to control prices or exclude competition." *E. I. du Pont*, 351 U.S. at 391. Plaintiffs have sufficiently pled that Defendants have such monopoly power.

Accepting the factual allegations in the amended complaint as true, Defendants' unit price book "is currently the only available option on the market." Am. Compl. ¶ 38; *id.* ¶ 40 ("Defendants are the only company that offers a [job order contracting unit price book] in Texas"). As a result, contractors "are now forced to use" that unit price book, as well as Defendants' management program, which "subjects [those] contractors to pay whatever price Defendants determine in order to participate in [job order contracting] projects." *Id.* ¶ 38. Moreover, in the year prior to Plaintiffs' attempted entry into the market, Defendants "literally controlled 100% of the market" for job order contracting unit price books, both nationally and in Texas, and "marked up prices" by 30%. *Id.* ¶ 36. These factual allegations,[14] along with those relating to Defendants' conduct during the period Plaintiffs attempted to market a competing unit

---

[14]   Contrary to Defendants' contention, these allegations are not "conclusory." *See* Mot. Dismiss 13. Courts "label allegations conclusory when they are vague, lacking in specifics, or amount to mere recitations of the relevant legal standards without any supporting factual narrative." *Morris v. Thaler*, 425 F. App'x 415, 423 (5th Cir. 2011) (per curiam) (unpublished opinion). Plaintiffs' allegations are none of those things. For example, the allegation that Gordian's acquisition of R.S. Means in 2014 gave Defendants control of "100% of the market" for unit price books is supported not only by the alleged 30% price hike, but also by allegations that "vendors no longer had a readily available alternative commercial" unit price book to use and that Plaintiffs' short-lived entry into the market gave customers "2 options" to select from. Am. Compl. ¶ 37.

price book, plausibly support the conclusion that Defendants possess monopoly power in the relevant market. *See Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 690 & n.62 (Tex. 2006) (75–80% market share was sufficient to support a finding of monopoly power).

Defendants rely on Scott Smith's declaration as factual proof that they "do not possess a monopoly or unlawful control of the market for commercially available construction cost data and pricing information." Mot. Dismiss 14. That document is not properly before the Court on this 12(b)(6) motion and cannot be considered.

Accordingly, Plaintiffs' monopolization claim should not be dismissed.

## 2. Plaintiffs Have Adequately Stated Their Attempted Monopolization Claim

To establish a claim for attempted monopolization, Plaintiffs must show that Defendants (1) have "engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Star Tobacco Inc. v. Darilek*, 298 F. Supp. 2d 436, 447–48 (E.D. Tex. 2003) (internal quotation marks omitted) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

There is no question that Plaintiffs have sufficiently pled the first element. Taking the factual allegations in the amended complaint as true and drawing all reasonable inferences in Plaintiffs' favor, Defendants made false assertions about Plaintiffs and threatened to pursue baseless legal action against them and others, all in an (ultimately successful) effort to undercut Plaintiffs' ability to compete in the market. That is "predatory or anticompetitive conduct." *See Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*, No. SA-15-CA-32, 2015 WL 6994438, at *5 (W.D. Tex. Oct. 15, 2015) ("Predatory or anticompetitive conduct is conduct which 'tends to impair the opportunities of rivals [and] either does not further competition on the merits or

does so in an unnecessarily restrictive way.'" (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985))).

Defendants assert that the amended complaint is "devoid of any factual allegations to establish the [Defendants'] 'specific intent to monopolize' or 'a dangerous probability of achieving monopoly power.'" Mot. Dismiss 12–13. Specific intent to monopolize "may be inferred from evidence of anticompetitive conduct." *Id.* at *7; *accord Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 915 (2d Cir. 1988) ("Proof of the first element of an attempted monopolization claim, anticompetitive conduct, may be used to infer the second element, specific intent to monopolize . . . ."). Because they have plausibly alleged that Defendants took anticompetitive action, Plaintiffs are entitled to an inference of specific intent.

As to the third element, the allegations of anticompetitive conduct, combined with the allegations supporting Plaintiffs' monopolization claim, are sufficient to plausibly show a "dangerous probability" that Defendants will achieve monopoly power. *See Nat'l Ass'n of Pharm. Mfrs.*, 850 F.2d at 915 ("[W]hen coupled with proof of monopoly power, evidence of anticompetitive conduct may also prove a dangerous probability of success."); *Universal Hosp. Servs.*, 2015 WL 6994438, at *7 (allegation that defendant was a "monopolist already" in a related market supported the "dangerous probability" element); *Avnet, Inc. v. Motio, Inc.*, No. 12-C-2100, 2015 WL 425442, at *6 (N.D. Ill. Jan. 30, 2015) (allegation that company and competitor's "products account for approximately 95% of the revenues in the market" plausibly supported conclusion that, if the competitor were "driven out" of the market, there was a dangerous probability that the company would achieve monopoly power); *Berman v. Riverbay Corp.*, No. 89-CIV-5538, 1990 WL 116765, at *2 n.3 (S.D.N.Y. Mar. 29, 1990) (allegations supporting monopolization claim also supported alternative claim for attempted monopolization).

Plaintiffs' attempted monopolization claim should not be dismissed.

## IV. CONCLUSION

The Court **RECOMMENDS** that Defendants' motion to dismiss Plaintiffs' First Amended Complaint be **DENIED**. The parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72. Failure to file timely objections may preclude appellate review of factual findings or legal conclusions, except for plain error. *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 825 (5th Cir. 2015).

Signed on April 24, 2017, at Houston, Texas.

_____
**Dena Hanovice Palermo**
**United States Magistrate Judge**